# 12-2557-bk(L)

**12-2497-bk(CON), 12-2500-bk(CON), 12-2557-bk(CON), 12-2616-bk(CON), 12-3422-bk(CON), 12-3440-bk(CON), 12-3582-bk(CON), 12-3585-bk(CON)**

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆◆

In Re: Bernard L. Madoff Investment Securities LLC,

*Debtor.*

IRVING H. PICARD, Trustee for the Liquidation of
Bernard L. Madoff Investment Securities LLC,

*Plaintiff-Appellant,*

(*caption continued on inside cover*)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR PLAINTIFF-APPELLANT IRVING H. PICARD, AS TRUSTEE FOR THE SUBSTANTIVELY CONSOLIDATED SIPA LIQUIDATION OF BERNARD L. MADOFF INVESTMENT SECURITIES LLC AND BERNARD L. MADOFF

DAVID J. SHEEHAN, ESQ.
OREN J. WARSHAVSKY, ESQ.
TRACY L. COLE, ESQ.
SEANNA R. BROWN, ESQ.
CARRIE A. LONGSTAFF, ESQ.
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
(212) 589-4200

*Attorneys for Plaintiff-Appellant
Irving H. Picard, As Trustee for
the Substantively Consolidated
SIPA Liquidation of Bernard L.
Madoff Investment Securities LLC
and Bernard L. Madoff*

(*Counsel continued on inside cover*)

SECURITIES INVESTOR PROTECTION CORPORATION,
Statutory Intervenor pursuant to Securities Investor Protection Act,
15 U.S.C. § 78eee(d),

*Intervenor-Appellant,*

—against—

IDA FISHMAN REVOCABLE TRUST, PAUL S. SHURMAN, in his capacity as co-trustee of the Ida Fishman Revocable Trust, WILLIAM SHURMAN, in his capacity as co-trustee of the Ida Fishman Revocable Trust and as Executor of the estate of Ida Fishman,

*Defendants-Appellees.*

---

HOWARD L. SIMON, ESQ.
WINDELS MARX LANE
  & MITTENDORF LLP
156 West 56th Street
New York, New York 10019
(212) 237-1000

*Conflicts Counsel for Trustee*

MATTHEW B. LUNN, ESQ.
YOUNG CONAWAY STARGATT
  & TAYLOR, LLP
Rockefeller Center
1270 Avenue of the Americas,
  Suite 2210
New York, New York 10020
(212) 332-8840

*Conflicts Counsel for Trustee*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................1

ARGUMENT ........................................................................3

I.    The Transfers at Issue Here Are Not Settlement Payments ................3

    A.    A Settlement Payment Requires Completion of a Securities Transaction ................................................3

    B.    Article 8 of the U.C.C. Is Inapplicable and Would Not Help Appellees Regardless ......................................6

II.    No Securities Contracts Exist Here ....................................8

    A.    The Account Opening Documents Are Neither Securities Contracts nor Master Agreements ........................8

    B.    BLMIS Customer Statements Did Not Create Enforceable Obligations for the Listed Securities ................12

    C.    No Transfer Was Made "In Connection With" Any Securities Contract ................................................16

III.    The Trustee's Interpretation of Section 546(e) Is Consistent With Bankruptcy Law and the *Net Equity Decision* ..........................18

IV.    SIPA and Section 546(e) Serve Different Purposes But Must Be Interpreted Consistently With One Another. .....................................21

    A.    Allowing Securities Claims for Customer Protection Is Not Relevant to Whether Securities Contracts Exist Under the Code ......................................................22

    B.    *Greiff* Creates a Conflict Between SIPA and Section 546(e) ..................................................24

V.    The Trustee Is Not Collaterally Estopped .........................................26

    A.    Appellees Concede the Issues Are Not Identical and the Trustee Did Not Have a Full and Fair Opportunity to Litigate ................................................27

    B.    *Katz* Was Not a Final Judgment on the Merits .......................29

VI.    PetCareRx is Outside the Scope of *Greiff* .........................................33

VII.    Mandatory Withdrawal of the Reference Was Improper ...................34

CONCLUSION ................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*In re 949 Erie St., Racine, Wis.*,
  824 F.2d 538 (7th Cir. 1987) ...........................................................31

*Ball v. A.O. Smith Corp.*,
  451 F.3d 66 (2d. Cir. 2006) ..............................................................27

*Bano v. Union Carbide Corp.*,
  273 F.3d 120 (2d Cir. 2001) .............................................................19

*Bayou Accredited Fund, LLC v. Redwood Growth Partners* (*In re Bayou Group, LLC*),
  396 B.R. 810 (Bankr. S.D.N.Y. 2008) ..............................................21

*In re Bernard L. Madoff Inv. Sec. LLC*,
  654 F.3d 229 (2d Cir. 2011) .....................................................*passim*

*Conn. Nat'l Bank v. Germain*,
  112 S. Ct. 1146 (1992) ......................................................................19

*Contemporary Indus. Corp. v. Frost*,
  564 F.3d 981 (8th Cir. 2009) ..........................................................3, 6

*Enron Corp. v. JP Morgan Sec., Inc.* (*In re Enron Corp.*),
  Nos. M-47 (GBD), 01-6034 (AJG), 2008 WL 281972 (S.D.N.Y. Jan 25, 2008) .............................................................................................34

*Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*,
  651 F.3d 329 (2d Cir. 2011) ..........................................3, 6, 17, 18

*Fed. Treasury Enter. Sojuzplodoimport v. SPI Spirits Ltd.*,
  726 F.3d 62 (2d Cir. 2013) ...............................................................19

*Garcia-Melendez v. Ashcroft*,
  351 F.3d 657 (5th Cir. 2003) .............................................................19

*Jackson v. Mishkin* (*In re Adler, Coleman Clearing Corp.*),
  263 B.R. 406 (S.D.N.Y. 2001) ..............................................5, 18, 24

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Johnson v. Neilson* (*In re Slatkin*),
    525 F.3d 805 (9th Cir. 2008) ........................................................17

*Kaiser Steel Corp. v. Charles Schwab & Co., Inc.*,
    913 F.2d 846 (10th Cir. 1990) .......................................................4

*Kaiser Steel Corp. v. Pearl Brewing Co.* (*In re Kaiser Steel Corp.*),
    952 F.2d 1230 (10th Cir. 1991) .....................................................4

*Kipperman v. Circle Trust F.B.O.* (*In re Grafton Partners, L.P.*),
    321 B.R. 527 (B.A.P. 9th Cir. 2005) ............................................17

*Lawlor v. Nat'l Screen Serv. Corp.*,
    349 U.S. 322 (1955)......................................................................28

*Leather v. Eyck*,
    180 F.3d 420 (2d Cir. 1999) .........................................................27

*Legnani v. Alitalia Linee Aree Italiane, SpA*,
    400 F.3d 139 (2d Cir. 2005) .........................................................28

*Lowneschuss v. Resorts Int'l, Inc.* (*In re Resorts Int'l, Inc.*),
    181 F.3d 505 (3d Cir. 1999) ...........................................................3

*Lummus Co. v. Commonwealth Oil Ref. Co.*,
    297 F.2d 80 (2d Cir. 1961) .....................................................30, 31

*Marvel Characters, Inc. v. Simon*,
    310 F.3d 280 (2d Cir. 2002) .........................................................30

*Motrade v. Rizkozaan, Inc.*,
    No. 95 Civ. 6545 (DC), 1998 WL 108013 (S.D.N.Y. Mar. 11, 1998)..............30

*Nemaizer v. Baker*,
    793 F.2d 58 (2d Cir. 1986) ...........................................................30

*In re New Times Sec. Serv., Inc.*,
    371 F.3d 68 (2d Cir. 2003) .....................................................15, 22

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Official Comm. of Unsecured Creditors of Nat'l Forge Co. v. Clark* (*In re Nat'l Forge Co.*),
  344 B.R. 340 (W.D. Pa. 2006)..............................................................5

*Official Comm. of Unsecured Creditors of Quebecor World (USA) Inc. v. Am. United Life Ins. Co.* (*In re Quebecor World (USA) Inc.*),
  480 B.R. 468 (S.D.N.Y. 2012) ........................................................4, 8

*Peterson v. Somers Dublin Ltd.*,
  729 F.3d 741 (7th Cir. 2013) ......................................................5, 20

*Picard v. Katz*,
  462 B.R. 447 (S.D.N.Y. 2011) ....................................................*passim*

*Picard v. Katz*,
  466 B.R. 208 (S.D.N.Y. 2012) ....................................................*passim*

*Picard v. Madoff* (*In re Bernard L. Madoff Inv. Sec. LLC*),
  458 B.R. 87 (Bankr. S.D.N.Y. 2011)............................................6, 17

*Picard v. Merkin* (*In re Bernard L. Madoff Inv. Sec. LLC*),
  2011 WL 3897970 (S.D.N.Y. Aug. 31, 2011)......................................6

*Picard v. Merkin* (*In re Bernard L. Madoff Inv. Sec. LLC*),
  440 B.R. 243 (Bankr. S.D.N.Y. 2010)................................................6

*Postlewaite v. McGraw-Hill Inc.*,
  333 F.3d 42 (2d Cir. 2003) ...........................................................28

*Proctor v. LeClaire*,
  715 F.3d 402 (2d. Cir. 2013) ....................................................26, 28

*Rosenman Family, LLC v. Picard*,
  395 F. App'x 766 (2d Cir. 2010) ....................................................18

*Sec. Investor Prot. Corp. v. Barbour*,
  421 U.S. 412 (1975)......................................................................22

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec.*,
  499 B.R. 416 (S.D.N.Y. 2013) ....................................................7, 14

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (*In re Bernard L. Madoff Inv. Sec.*),
424 B.R. 122 (Bankr. S.D.N.Y., 2010) .........................................................15, 16

*Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*,
490 B.R. 46 (S.D.N.Y. 2013) ...............................................................35

*Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.* (*In re Stratton Oakmont, Inc.*),
257 B.R. 644 (Bankr. S.D.N.Y. 2001)................................................20

*Siemens Med. Sys. Inc. v. Nuclear Cardiology Sys. Inc.*,
943 F. Supp (D. Colo. 1996)..............................................................32

*St. Paul Fire & Marine Ins. Co. v. F.H.*,
55 F.3d 1420 (9th Cir. 1995) ............................................................32

*Stern v. Marshall*,
1315 S.Ct. 2594 (2011).............................................................34, 35

*Studio Art Theater of Evansville, Inc. v. City of Evansvile, Ind.*,
76 F.3d 128 (7th Cir. 1996) ..............................................................29

*TM Patents v. Int'l Bus. Mach. Corp*.,
72 F.Supp.2d 370 (S.D.N.Y. 1999) ...................................................32

*Wellons, Inc. v. T.E. Ibberson Co.*,
869 F.2d 116 (8th Cir. 1989) ...........................................................30

*Wider v. Wootton*,
907 F.2d 570 (5th Cir. 1990) ...........................................................17

*Wolkowitz v. Shearson Lehman Bros. Inc.* (*In re Weisberg*),
136 F.3d 655 (9th Cir. 1998) ...........................................................10

*Wolkowitz v. Shearson Lehman Bros. Inc.* (*In re Weisberg*),
193 B.R. 916 (B.A.P. 9th Cir. 1996) .................................................10

**STATUTES**

11 U.S.C. § 546(e) .........................................................................*passim*

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

11 U.S.C. § 548(a)(1)(A) ....................................................25

11 U.S.C. § 741 ...................................................................8

11 U.S.C. § 741(7) .........................................................*passim*

11 U.S.C. § 741(7)(vii) ......................................................11

11 U.S.C. § 741(7)(A)(i) ....................................................11

11 U.S.C. § 741(7)(A)(x) .....................................................9

15 U.S.C. § 78bb ...............................................................16

15 U.S.C. § 78eee-(b)(4) ....................................................34

15 U.S.C. § 78fff-2(c)(3) ................................18, 22, 25, 26

15 U.S.C. § 78*lll*(2)(B)(i) .................................................22

15 U.S.C. § 78*lll*(4) .........................................................18

N.Y. U.C.C. § 8-501(b)(1) ....................................................7

N.Y. U.C.C. § 8-503 cmt.1 ...................................................6

**RULES**

17 C.F.R. § 240.10b-5 .......................................................16

17 C.F.R. § 300.503(a) ......................................................24

Fed. R. Civ. P. 12(b) .........................................................29

Fed. R. Civ. P. 54(b) ....................................................27, 33

**OTHER AUTHORITIES**

6 *Collier on Bankruptcy* ¶ 749.02[1] (16th ed. 2011) ...............26

H.R. Rep. No. 108-40, pt. 1 (2003) .......................................11

2A N. Singer, *Sutherland on Statutory Construction* § 47:11 (7th ed. 2013) .........19

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

16A Wright, Miller & Cooper, *Federal Practice and Procedure:
Jurisdiction* § 3975.1 (3d ed. 1999)....................................................................19

## INTRODUCTION

Viewed together, section 546(e) of the Bankruptcy Code and SIPA demonstrate the careful balance that Congress struck between ensuring that customers of a failed broker are treated fairly and minimizing disruption in the securities markets. On the one hand, SIPA achieves fairness by providing that each customer receives a ratable distribution of customer property—no more, no less. And, on the other, section 546(e) protects the securities markets by providing a limited exception from avoidance for certain financial transactions that, if unwound, would disrupt the securities markets.[1]

Appellees seek to upset this balance by reading the exception to swallow the rule: even where there is no risk to the securities markets—because no securities transactions were attempted or completed—the "net winners" of BLMIS's fraud still get to keep their winnings, at the expense of their fellow customers and in violation of SIPA's recovery and ratable distribution scheme. But the plain language of section 546(e) is to the contrary.

---

[1] Capitalized terms not otherwise defined herein shall have the same meaning ascribed to them in the Trustee's Brief ("Trustee. Br."). In addition, this brief cites to the Brief of Certain Eligible Action Defendant-Appellees ("Evenstad Br."), Joint Brief of Customer Appellees ("Fishman Br."), Brief for Defendant-Appellee PetCareRx, Inc. ("PetCareRx Br."), Brief of Appellees ("Abel Br."), Brief for Amicus Curiae Securities Industry and Financial Markets Association ("SIFMA Br."), and Brief of Amici Curiae Financial Institution Defendants ("HSBC Br.").

By its terms, section 546(e) applies to securities transactions. It protects transfers that are either settlement payments (which result from completing securities transactions) or made in connection with contracts for the purchase or sale of securities (which by their terms effectuate securities transactions). None exist here. Appellees and the district court do not even agree as to what kind of "securities contract" is purportedly created by the Account Opening Documents. And without any securities transactions to complete, payments to customers by BLMIS "settled" nothing.

Appellees misleadingly claim that "[f]ive circuit courts (including this Court) have . . . affirmed Section 546(e)'s 'safe harbor' protection, as a matter of law." (Evenstad Br. 14). But no court, except the district court below, has applied the safe harbor where no securities trading occurred, merely because the recipient *believed* there was securities trading. Even Appellees concede, as they must, that no basis exists to "graft onto the statute a subjective customer reliance factor." (Evenstad Br. 59).

On the facts here, where the transfers between BLMIS and its customers involved no securities, settled no transactions, and merely consisted of cash flowing among customers, section 546(e) is inapplicable on its face. And, in furtherance of the balance struck by Congress, the Trustee must be able to use the

full avoidance powers granted to him by SIPA and the Bankruptcy Code to make a ratable distribution of customer property.

Stretching section 546(e) to encompass Madoff's fraud would distort the safe harbor beyond recognition and violate SIPA and the Bankruptcy Code. It would also perpetuate Madoff's fiction and give effect to a fraud, which this Court previously recognized would constitute legal error. *Greiff* should be reversed.

## ARGUMENT

I. **The Transfers at Issue Here Are Not Settlement Payments**

A. **A Settlement Payment Requires Completion of a Securities Transaction**

No matter how often Appellees stress that the definition of settlement payment is "extremely broad," this Court, like other courts to consider the matter, has determined that "a settlement payment refers to 'the completion of a securities transaction.'" *Enron Creditors Recovery Corp. v. Alfa, S.A.B. de C.V.*, 651 F.3d 329, 336-37 (2d Cir. 2011) ("*Enron*") (quoting *Contemporary Indus. Corp. v. Frost*, 564 F.3d 981, 985 (8th Cir. 2009)); *Lowneschuss v. Resorts Int'l, Inc.* (*In re Resorts Int'l, Inc.*), 181 F.3d 505, 515 (3d Cir. 1999), *cert. denied*, 528 U.S. 1021 (1999) ("[i]n the securities industry, a settlement payment is generally the transfer

of cash or securities made to complete a securities transaction").[2]  It is not the Trustee but this Court that has determined that a securities transaction must, at a minimum, be "lurking in the background."  (Evenstad Br. 32).

Other than the district court below, no court found "settlement payments" where there were no securities transactions.  *See Kaiser Steel Corp. v. Charles Schwab & Co., Inc.*, 913 F.2d 846, 850 (10th Cir. 1990) ("[t]he transfer of money and preferred stock was the settlement of that transaction"); *Official Comm. of Unsecured Creditors of Quebecor World (USA) Inc. v. Am. United Life Ins. Co.* (*In re Quebecor World (USA) Inc.*), 480 B.R. 468, 475 (S.D.N.Y. 2012), *aff'd,* 719 F.3d 94 (2d Cir. 2013) ("a settlement payment, quite simply, is a transfer of cash [to a financial institution] . . . made to complete [a] securities transaction") (internal citations omitted).[3]  Fictional transactions do not fit within the definition

---

[2] Payments like those discussed in the SIPC testimony (Evenstad Br., Addendum at 287), such as margin, mark-to-market, settlement payment, or a deposit to a clearing broker or clearing agency, are all examples of settlement payments that, by definition, occur only after brokers enter the market and transact with counterparties to obtain securities.  The payments here were to customers but never "settle[d] a customer's account with its broker."  See *Kaiser Steel Corp. v. Pearl Brewing Co.* (*In re Kaiser Steel Corp.*), 952 F.2d 1230, 1238 (10th Cir. 1991).

[3] This interpretation is consistent with the explanation provided by the Securities and Exchange Commission ("SEC").  The SEC describes "settlement" as "the delivery and receipt of funds and securities."  Securities Exchange Act Release No. 20,221 n.33 (Sept. 23, 1983); Securities Exchange Act Release No. 13,163 n. 56 (Jan. 13, 1977).

of settlement payment. *Jackson v. Mishkin* (*In re Adler, Coleman Clearing Corp.*), 263 B.R. 406, 482 (S.D.N.Y. 2001) (payments for phony book entries do not constitute settlement payments because the "trades involving them never settled"). Even in *Peterson*, where the Seventh Circuit applied section 546(e) against the backdrop of fraud, the court found the safe harbor triggered because there was a swap of money for shares in a fund—the settlement of an actual securities transaction. *Peterson v. Somers Dublin Ltd.*, 729 F.3d 741, 744 (7th Cir. 2013). Similarly, notwithstanding plaintiff's argument (cited by Appellees) in *Official Comm. of Unsecured Creditors of Nat'l Forge Co. v. Clark* (*In re Nat'l Forge Co.*), 344 B.R. 340 (W.D. Pa. 2006), that court also agreed that a settlement payment involves the "transfer of cash or securities made to complete a securities transaction." *Id.* at 366.

Notably, SIFMA does not even argue that the transfers are settlement payments. To the contrary, SIFMA differentiates the securities contract prong from the settlement payment prong, stressing that they must be given different meanings to avoid rendering one prong of the statute superfluous. SIFMA then relies exclusively on the securities contract prong, thus conceding that the transfers here are not settlement payments. (SIFMA Br. 11-12).

Finally, even if the safe harbor applied, the facts surrounding each transfer must be analyzed. For example, the specific securities transaction that resulted in a

5

settlement payment must be identified to determine whether the payment completed a securities transaction. The mere assertion that every transfer constituted a settlement payment is insufficient. (Trustee Br. 56). And determining the application of section 546(e) after discovery has not created commercial uncertainty. *See Contemporary Indus. Corp.*, 564 F.3d at 989 (affirming grant of summary judgment in section 546(e) dispute); *Enron*, 651 F.3d at 339 (same); *cf. Picard v. Merkin* (*In re Bernard L. Madoff Inv. Sec. LLC*), 2011 WL 3897970, at *12 (S.D.N.Y. Aug. 31, 2011) (denying section 546(e) at pleading stage); *Picard v. Merkin* (*In re Bernard L. Madoff Inv. Sec. LLC*)*,* 440 B.R. 243, 267 (Bankr. S.D.N.Y. 2010) (same); *Picard v. Madoff* (*In re Bernard L. Madoff Inv. Sec. LLC*), 458 B.R. 87, 115-17 (Bankr. S.D.N.Y. 2011) ("*Madoff Family*") (same).

### B.   Article 8 of the U.C.C. Is Inapplicable and Would Not Help Appellees Regardless

Appellees misguidedly turn to Article 8 of the New York Uniform Commercial Code to assert that "settlement payments" existed even though no securities transactions were ever completed. But the U.C.C. does not apply here; it is trumped by the Bankruptcy Code and SIPA. *See* N.Y. U.C.C. § 8-503 cmt.1 (2013). And neither this Court nor the district court below has accepted the argument that the U.C.C. applies to the relationship between BLMIS and its customers. *See generally In re Bernard L. Madoff Inv. Sec. LLC*, 654 F.3d 229 (2d

6

Cir. 2011) ("*Net Equity Decision*") (upholding Trustee's methodology without discussing customers' U.C.C. arguments).

As discussed below in Section II(B), Appellees' argument that customer statements created entitlements to the listed securities contravenes SIPA, as set forth in the *Net Equity Decision*. *See also Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec.*, 499 B.R. 416, 420-21 (S.D.N.Y. 2013) ("*Antecedent Debt Decision*"). Appellees also are wrong under state law. Section 8-501(b)(1) provides for a "security entitlement" when "a securities intermediary . . . indicates by *book entry* that a financial asset has been credited to the person's securities account." N.Y. U.C.C. § 8-501(b)(1) (2013) (emphasis added). Customer statements and trade confirmations, even legitimate ones, do not constitute "book entries" under the U.C.C. As the SEC previously explained in this liquidation, "[a]ccount statements and confirmations sent to customers are not books used by brokerage firms to make entries crediting and debiting customer accounts with securities transactions." Br. for the Sec. Exch. Comm'n at 11, n.5, *In re Bernard L. Madoff Sec. LLC*, No. 10-2378 (2d Cir. Sept. 21, 2010), ECF No. 296.

SIFMA's concern that customers who cannot rely on statements will be reduced to hoarding paper stock certificates is misplaced. Section 546(e) does not determine ownership of securities or address the records issue posited by SIFMA; it merely prevents a trustee from avoiding certain transfers. Nor was it intended to

7

protect investors from risky or fraudulent investments.  The fact that risk exists in

relation to investing provides no basis to apply section 546(e) to a fictitious market

like the one created by Madoff.  *See Net Equity Decision*, 654 F.3d at 239.

## II.   No Securities Contracts Exist Here

### A.   The Account Opening Documents Are Neither Securities Contracts nor Master Agreements

Deviating from the text of section 741(7), Appellees re-define a securities

contract as one that "plainly anticipate[s]" securities trading (Evenstad Br. 21);

"involv[es]" securities transactions (Fishman Br. 20); or is "for the purpose" of

securities trading (SIFMA Br. 14).[4]  These proposed revisions would render the

definition so broad as to be essentially limitless—for example, an elderly parent's

assignment of power of attorney to her child could well involve, anticipate, or be

made for the purpose of trading securities.  But the statutory definition is clear: it

applies only to contracts "for" the purchase or sale of a security.  *See In re*

*Quebecor*, 480 B.R. at 479 (emphasis in original) ("Section 741(7) *does* include a

purchase-or-sale requirement, as it expressly defines 'securities contract' to mean a

contract 'for the purchase, sale or loan of a security.'").

---

[4] Appellees argue that the 1934 Act defines "purchase" and "sell" to include
"otherwise acquire" or "otherwise dispose of."  (Fishman Br. 21).  But the relevant
definition is section 741 of the Code, not the Securities Act.  Regardless, the
Account Opening Documents did not, by their terms, "acquire" or "dispose" of any
securities.

Even if BLMIS had engaged in securities trading, the Account Opening Documents would not constitute securities contracts. Any securities contracts would have arisen through BLMIS's trading activities in the securities markets, if BLMIS had contracted with a counterparty to purchase or sell a specified security on a specified date at a specified price. No such contracts were entered into here.[5]

The district court did not find that the Account Opening Documents were contracts for the purchase, sale, or loan of securities. Instead, it characterized them as "master agreements" and "security agreements." Notably, Appellees abandon the district court's determination that the Account Opening Documents were "security agreements," and offer only a cursory argument that the Account Opening Documents were "master agreements."[6] As to the latter point, it speaks volumes that SIFMA—an entity that offers form master agreements for the

---

[5] Whether the Account Opening Documents may have been breached (by BLMIS's failure to trade securities) is irrelevant to whether they meet the definition for securities contracts under section 741(7), *i.e.*, whether they contain terms for the purchase, sale, or loan of a security. And contrary to SIFMA's assertion, the Trustee does not concede they are binding contracts. (SIFMA Br. 13).

[6] Appellees claim that the existence of the master agreement provision shows that a "securities contract" need not purport to effect the purchase, loan, or sale of securities. Just the opposite: master agreements are encompassed "only with respect to each agreement or transaction under such master agreement . . ." that is itself a securities contract. 11 U.S.C. § 741(7)(A)(x).

securities industry—does not even acknowledge Appellees' "master agreement" contention, much less support it.

Like the district court, no Appellee or Amicus can cite to any contractual language or provisions in the Account Opening Documents for the purchase, sale, or loan of a security that would create a "securities contract." Nor can they point to any law that does so. The only relevant case cited, *Wolkowitz v. Shearson Lehman Bros. Inc.* (*In re Weisberg*), 136 F.3d 655, 658 (9th Cir. 1998), addressed section 741(7) in determining whether the automatic stay was violated when a broker sold a debtor's securities from a margin account. The Ninth Circuit concluded that the margin transaction was "the type of transaction Congress intended to exempt" from the stay. *Id.* at 659. While acknowledging the lower court's finding that a broker's client agreement "did not technically fit the Code's definition of a securities contract," the Ninth Circuit found that it was "in substance" and "in effect" a securities agreement because it provided for liquidation of securities after a margin call. *Id.* at 658-59.[7]

---

[7] In contrast, the Bankruptcy Appellate Panel in *Weisberg* concluded that it was the pledge of the securities to the margin account, not the client agreement, that constituted a "securities contract" for purposes of the Code. *Wolkowitz v. Shearson Lehman Bros. Inc.* (*In re Weisberg*), 193 B.R. 916, 924 (B.A.P. 9th Cir. 1996), *aff'd in part*, *rev'd in part*, *In re Weisberg*, 136 F.3d at 655.

That the Ninth Circuit disregarded the "technical" language of section 741(7) to exempt a specific margin transaction from the automatic stay is of no help to Appellees here. Appellees ask this Court to apply section 546(e) to shield billions of dollars in cash transfers that were unrelated to any securities transactions. To disregard both the plain language of the statute and its purpose is a perversion of the law.

Finally, Appellees invoke the catch-all provision in section 741(7)(vii). But the district court did not rely on this provision, and it does not support Appellees' argument. The phrase "or any similar agreement" was added to the statutory definitions of swap agreement, forward contract, commodity contract, repurchase agreement, and securities agreement "to provide sufficient flexibility to avoid the need to amend the definition as the nature and uses of [these] transactions matured." H.R. Rep. No. 108-40, pt. 1, at 232 (2003). The drafters cautioned this provision was not intended to protect transactions that do not otherwise fit within the four corners of the statute. *Id.*

Here, the Account Opening Documents are standard forms to open a brokerage account. Similar forms were used for the same purpose well before the addition of the catch-all provision in 2005. Accordingly, the Account Opening Documents either fit within section 741(7)(A)(i)'s definition of "securities contract" or they are not encompassed by the statute; the catch-all provision is

11

inapplicable.  Nor are the Account Opening Documents "similar" to a contract for the purchase, sale, or loan of a security.  They do not contain a single essential term that would allow a court to enforce a purchase, sale, or loan of any security.

### B.  BLMIS Customer Statements Did Not Create Enforceable Obligations for the Listed Securities

In recognition that the Account Opening Documents are not securities contracts, Appellees turn elsewhere—and beyond the district court's decision—to find other "securities contracts."  Wisely, Appellees do not argue that the BLMIS customer statements created a "securities contract."  They instead assert that they had "securities entitlements" under state law and that customer cash withdrawals satisfied these entitlements, constituting "sale contracts" or settlement payments.  But in order for any such entitlements to exist, Appellees must first have enforceable rights to identifiable securities, which they do not.  The Account Opening Documents identify no specific securities.  And this Court has already ruled that Appellees are not entitled to the securities on the customer statements.  *Net Equity Decision,* 654 F.3d at 241.

Appellees first argue that each withdrawal constituted a "sell order" to BLMIS to liquidate one or more securities, thereby completing a securities contract.  (Fishman Br. 23, SIFMA Br. 14).  But no Appellee ever issued a "sell order" to BLMIS or directed BLMIS to sell any particular security, and no such document is in the record on appeal.  Indeed, the notion that any ordinary customer

12

issued a "sell order" contravenes the services that Madoff purportedly provided: a discretionary trading strategy determined by Madoff, not individual customers, consisting of basket trading for customer accounts, as Appellees themselves acknowledge. (Evenstad Br. 5-6; Fishman Br. 4-5).

The Account Opening Documents did not obligate BLMIS to purchase or sell securities or to fund withdrawals from the sale of securities. Appellees argue that each withdrawal nonetheless created a separate contract for the sale of securities, urging that under the UCC the "broker's written *crediting of securities to a customer's account* creates an enforceable securities entitlement." (Fishman Br. 22-23 (emphasis added)). This is merely another way of arguing that BLMIS customer statements created an enforceable obligation for the securities listed upon them—a notion this Court has already rejected.

Appellees' argument for "settlement payment" rests on the same faulty predicate. They assert that by sending "periodic statements and trade confirmations" to customers, BLMIS became obligated to customers for "securities entitlements." When customers withdrew money, Appellees posit, the withdrawal completed a securities transaction, rendering the transfers settlement payments. (Fishman Br. 34; Evenstad Br. 33-34; HSBC Br. 6-7). Like Appellees' argument that each withdrawal constituted a sale contract, this argument necessarily assumes that the customer statements created an obligation against BLMIS for, and a

13

customer's entitlement to, the securities identified on the face of the customer statements.

BLMIS customer statements were fictional, after-the-fact misrepresentations that Madoff created to perpetuate his fraud. Just as an error in a customer statement mistakenly crediting securities to an account would not create a contractual entitlement to those securities, Madoff did not create a contractual entitlement for securities he arbitrarily pretended to assign to customer accounts. Under Appellees' theory, a customer could prove an "entitlement" to billions of dollars of securities by merely pointing to a clearly fictitious statement fraudulently created by his broker.

This Court rejected the premise underlying both of these arguments in holding that BLMIS's fictitious statements—which reflected only Madoff's fictitious market—did not obligate BLMIS to deliver the depicted securities. *Net Equity Decision*, 654 F.3d at 241; *see also Antecedent Debt Decision*, 499 B.R. at 421 n.4 (BLMIS statements were "invalid and thus entirely unenforceable"). BLMIS's obligations to its customers are not reflected on the statements because any obligations of a debtor cannot be based on a fictitious market. Instead, BLMIS's obligations are found in the books and records of the debtor, which show the cash amounts customers deposited and withdrew. *Net Equity Decision*, 654 F.3d at 237.

14

Appellees have no "entitlements" to the securities reported on the customer statements because Madoff never purchased them.  More fundamentally, the securities *could never* have been purchased in the real marketplace.  Many times, the purported trades were outside a security's daily price range and/or reflected purported trades exceeding the entire market volume for a security.  *Id.* at 232.  Although dressed up with the names of real securities, the customer statements reflected only a fictitious market created by Madoff.  *Id.* at 241; *In re New Times Sec. Serv., Inc.*, 371 F.3d 68, 75 (2d Cir. 2003).

For the same reason, Appellees have no "entitlements" to securities for which they never bargained and never paid.  While initial deposits made by BLMIS customers might have covered the initial fake "purchase" of securities reported on the statements, subsequent "purchases" of equal or greater value could only be afforded by using the fictional "profits" recorded on customer statements.  *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC* (*In re Bernard L. Madoff Inv. Sec.*), 424 B.R. 122, 139-140 (Bankr. S.D.N.Y., 2010).   Consequently, not only were the purported securities purchases imaginary, the purported payments for those securities purchases were equally imaginary.  Appellees' principal was never exposed to the risk and fluctuations of the real securities market; Appellees instead enjoyed consistent "profits" used for imaginary "purchases" of more securities.  *Net Equity Decision*, 654 F.3d at 232.

15

In these circumstances, the customer statements cannot create entitlements to the listed securities. *Id.* And if Appellees are not entitled to those securities listed on the statements, it is difficult to conceive of some other set of securities to which they could possibly be entitled. Absent such obligation and a corresponding entitlement to specific securities, the transfers "satisfy" or "settle" nothing.

### C.    No Transfer Was Made "In Connection With" Any Securities Contract

Appellees miss the mark by relying on cases in which Madoff was found to have made misrepresentations "in connection with the purchase or sale of a security" under Rule 10(b)-5 or "in connection with the purchase or sale of a covered security" for purposes of SLUSA. Rule 10(b)-5 creates a cause of action based on misrepresentations "in connection with" the purchase or sale of securities, and SLUSA preempts state law claims that are based on such misrepresentations. 17 C.F.R. § 240.10b-5 (2013); 15 U.S.C. § 78bb (2010). But the nature of Madoff's misrepresentations is not at issue here.

Unlike SLUSA and Rule 10(b)-5, section 546(e) is not concerned with misrepresentations or the subject of those misrepresentations. It instead is concerned with *transfers* that were made "in connection with" a contract for the purchase, sale or loan of a security. Since BLMIS never purchased, sold, or loaned securities or entered into agreements that would by their terms have done so, there

16

were no such transfers that come within the safe harbor. The fact that Madoff

chose securities as the subject matter of his misrepresentations is irrelevant.

SIFMA asserts that failing to apply section 546(e) to this fraud "would jolt

investors' faith in their investment advisers, to the detriment of the efficiency and

liquidity of the securities markets." (SIFMA Br. 27). This claim rings hollow

given that, until *Greiff*, no court ever applied section 546(e) based on customer

expectations or to shield transfers made in connection with a Ponzi scheme. To the

contrary, courts routinely declined to apply the safe harbor to transfers made

pursuant to a fraud, because to do so would undermine rather than promote

confidence in the markets. *See, e.g.*, *Johnson v. Neilson* (*In re Slatkin*), 525 F.3d

805, 819 (9th Cir. 2008); *Wider v. Wootton*, 907 F.2d 570, 573 (5th Cir. 1990);

*Kipperman v. Circle Trust F.B.O.* (*In re Grafton Partners, L.P.*), 321 B.R. 527,

539 (B.A.P. 9th Cir. 2005) ("The few decisions that involve outright illegality or

transparent manipulation reject § 546(e) protection."); *Madoff Family*, 458 B.R. at

115-17. And courts did so both before and after the Financial Netting

Improvements Act of 2006 added the securities contract prong to the statute. *See,*

*e.g., In re Slatkin*, 525 F.3d at 819; *Madoff Family,* 458 B.R. at 117.

This Court's holding in *Enron* does not support SIFMA's argument. There,

this Court examined a transfer and found that, because it completed a securities

transaction, it was a settlement payment. *Enron*, 651 F.3d at 335-36. *Enron* did

not hold that the safe harbor should be expanded *beyond* its plain language to protect transfers that did not relate to securities merely because a fraudster misrepresented that they did.  To the contrary, *Enron* teaches that the plain language of the statute, and the factual substance of the transfer, must govern. *Enron*, 651 F.3d at 339.

### III.   The Trustee's Interpretation of Section 546(e) Is Consistent With Bankruptcy Law and the *Net Equity Decision*

A fundamental premise of both the Bankruptcy Code and SIPA is that a trustee may avoid fraudulent and preferential transfers of a debtor.[8]  The purpose of avoidance powers is to "maximize assets available for ratable distribution to all creditors similarly situated" and to "avoid placing some claims unfairly ahead of others."  *In re Adler, Coleman*, 263 B.R. at 463.  Section 546(e) is a limited exception to these powers, enacted to prevent market disruption that would result from unwinding settled securities trades.  *Enron*, 651 F.3d at 334.

_____

[8] Appellee David Abel's argument that the Trustee lacks standing to bring avoidance actions is baseless.  (Abel Br. 1,4).  Abel asserts that because a thief does not take title to stolen property, the funds transferred to BLMIS never became property of the estate.  This Court already rejected the argument that BLMIS did not acquire title to funds because they were stolen and held that funds transferred to BLMIS by a customer were part of the BLMIS estate.  *Rosenman Family, LLC v. Picard*, 395 F. App'x 766, 769 (2d Cir. 2010).  And SIPA and the Bankruptcy Code are clear that a trustee is vested with the power to bring statutory avoidance claims on behalf of the estate to recovery customer property, including property unlawfully converted.  SIPA §§ 78fff-2(c)(3); 78*lll*(4).

Section 546(e) is clear that it covers only transfers in connection with

securities contracts or settlement payments.  It does not encompass transfers where

no securities transaction was ever attempted or made.  "[C]ourts must presume that

a legislature says in a statute what it means and means in a statute what it says

there."  *Conn. Nat'l Bank v. Germain*, 112 S. Ct. 1146, 1149 (1992).[9]  Moreover,

canons of statutory construction require that exceptions like section 546(e) be

construed narrowly and not be judicially extended.  2A N. Singer, *Sutherland on

Statutory Construction* § 47:11 (7th ed. 2013).  *Greiff* violates this bedrock

---

[9] The Financial Institution Defendants argue that section 546(e) protection should
extend to certain secondary transactions present in their cases.  (HSBC Br. 11-16).
Appellees here, on the other hand, only received initial transfers of fictitious
profits.  As such, the issue of whether section 546(e)'s safe harbor applies to
secondary transactions was not decided below, is not at issue before this Court, and
was not briefed by any party to this appeal.  The Financial Institution Defendants'
attempt to inject new issues into this appeal violates basic restrictions on
participation as amici—namely, that the issues on appeal are those presented by the
parties and cannot be expanded by an amicus brief.  *See, e.g., Fed. Treasury Enter.
Sojuzplodoimport v. SPI Spirits Ltd.*, 726 F.3d 62, 82 (2d Cir. 2013) ("[A]n amicus
brief is not a method for injecting new issues into an appeal."); *Garcia-Melendez v.
Ashcroft*, 351 F.3d 657, 663 n.2 (5th Cir. 2003) ("[A]n amicus curiae generally
cannot expand the scope of an appeal to implicate issues that have not been
presented by the parties to the appeal); *Bano v. Union Carbide Corp.*, 273 F.3d
120, 128 n.5 (2d Cir. 2001) ("In ordinary circumstances, an amicus will not be
permitted to raise issues not argued by the parties.") (quoting 16A Wright, Miller
& Cooper, *Federal Practice and Procedure: Jurisdiction* § 3975.1 (3d ed. 1999)).
Moreover, the issues raised by the Financial Institution Defendants are currently
pending in cases before the district court and are neither necessary nor relevant to a
determination of the issues here.

principle by expanding the safe harbor to encompass customer expectations that are referenced in neither the text nor legislative history of section 546(e).

While section 546(e) may not require a showing that avoiding transfers will cause market disruption, it certainly requires some intersection between the transfers here and the actual securities markets. Because BLMIS undertook no trades for its customers, the transfers of cash between BLMIS and its customers occurred in a closed loop that never touched any securities or the securities markets.[10] *Net Equity Decision*, 654 F.3d at 232 (customer funds were never exposed to the securities markets). As such, this is not a case in which a debtor engaged in securities transactions for a fraudulent purpose, *see, e.g.*, *Sec. Investor Prot. Corp. v. Stratton Oakmont, Inc.* (*In re Stratton Oakmont, Inc.*), 257 B.R. 644, 647-50 (Bankr. S.D.N.Y. 2001), or a Ponzi scheme in which victims purchased securities issued by the worthless enterprise. *See Peterson,* 729 F.3d at 744. Thus, denying application of the safe harbor here is not creating a "Ponzi–scheme exception;" it merely recognizes that where the transfers do not implicate securities and the securities markets, whether related to a Ponzi scheme or not, those transfers are beyond the scope of section 546(e).

---

[10] The fact that BLMIS had 4,900 customer accounts with a purported value of $65 billion shows nothing but the size and scope of the Ponzi scheme.

Artificially restricting the Trustee's avoidance powers would not serve equity here. Fraudulent transfer laws are not punitive provisions "designed to punish the transferee," but instead "place[] the transferee in the same position as other similarly situated creditors who did not receive fraudulent [transfers]." *Bayou Accredited Fund, LLC v. Redwood Growth Partners* (*In re Bayou Group, LLC*), 396 B.R. 810, 827 (Bankr. S.D.N.Y. 2008). Thousands of good faith customers signed Account Opening Documents but, unlike Appellees, did not receive fictitious profits. While extending section 546(e) beyond its language and purpose might benefit Appellees, it would do so to the detriment of those customers who have not recovered their principal. Treating fictitious trades as real here would, just as in the *Net Equity Decision*, unfairly place the claims of Appellees ahead of other similarly situated customers. *Net Equity Decision*, 654 F.3d at 242 n.10.

## IV.  SIPA and Section 546(e) Serve Different Purposes But Must Be Interpreted Consistently With One Another.

Appellees claim—without citation—that section 546(e) is a customer protection statute.[11] While section 546(e) may shield securities market participants

---

[11] No Appellee asserts that he relied on the existence of the safe harbor when investing with BLMIS. Yet numerous Appellees, represented by the same counsel when the Net Equity appeal was before this Court, asserted that SIPA protection impacted their decision to invest. Brief for Appellants at 31, *In re Bernard L. Madoff Sec. LLC*, No. 10-2378 (2d Cir. Aug. 10, 2010), ECF No. 215.

from the avoidance of certain transfers, it is indisputable that SIPA is the statute

Congress enacted to protect customers whose brokerages fail. *Sec. Investor Prot.*

*Corp. v. Barbour*, 421 U.S. 412, 421 (1975). SIPA does so by returning to

customers their property or money entrusted to their broker. If their property was

fraudulently transferred by the debtor, SIPA provides that a trustee must avoid and

recover customer property to make distributions to protected customers. SIPA §

78fff-2(c)(3).

###     A.     Allowing Securities Claims for Customer Protection Is Not Relevant to Whether Securities Contracts Exist Under the Code

SIPA § 78*lll*(2)(B)(i) provides that claimants that deposit cash with a broker

"*for the purpose of* purchasing securities" are customers entitled to SIPA

protection. SIPA § 78*lll*(2)(B)(i) (emphasis added). SIPA divides customer claims

into "claims for securities" (eligible for $500,000 in advances from SIPC) and

"claims for cash" (eligible for $100,000). This Court's prior decisions confirm that

BLMIS customers have "claims for securities" under SIPA, providing them with

the maximum relief of up to $500,000. This fulfills SIPA's customer protection

mandate. *See Net Equity Decision*, 654 F.3d at 235; *In re New Times Sec. Serv.,*

*Inc.*, 371 F.3d at 86.

Notably, customer protection under SIPA is not based on the Account

Opening Documents. Where BLMIS customers deposited cash to purchase

securities, they are entitled to SIPA protection regardless of whether they signed

22

Account Opening Documents. Such protection would exist even if BLMIS had

dispensed with Account Opening Documents altogether.

Appellees propose that because a customer has a claim for securities under

SIPA, the Account Opening Documents must be securities contracts under section

546(e). This false syllogism ignores the plain language of both statutes. SIPA

defines a customer as one who deposited cash "for the purpose of purchasing

securities." Section 741(7) of the Code, in contrast, does not encompass all

contracts "for the purpose of" transacting securities but only those contracts "for

the purchase, sale, or loan of a security."

Appellees' arguments also ignore the purposes of the respective statutes.

SIPA was enacted to protect customers of broker-dealers by maximizing return of

customer property after a brokerage fails. Section 546(e), which limits a trustee's

avoidance powers and thus his ability to accomplish SIPA's goals, was designed to

protect the securities market, not customers. The safe harbor therefore protects

only specified securities transactions, regardless of a customer's subjective belief.

Thus, while customer expectations may create a securities claim under SIPA, they

cannot transform the Account Opening Documents into securities contracts under

the Code.

Finally, whether a customer claim is treated as one for cash or securities is

not relevant to, let alone dispositive of, the unrelated issue of whether a transfer is

avoidable.  SIPA's implementing rules explicitly state that a trustee's ability to recover transfers is not impeded by a determination that a customer has a "securities claim" under SIPA: "[n]othing in these Series 500 Rules shall be construed as limiting the rights of a trustee in a liquidation proceeding under the Act to avoid any securities transaction as fraudulent, preferential, or otherwise voidable under applicable law."  17 C.F.R. § 300.503(a); *see also In re Adler, Coleman*, 263 B.R. at 435 (SIPC 500 Rules manifest a "design to deny protection to transactions tainted by fraud.").

### B.    *Greiff* Creates a Conflict Between SIPA and Section 546(e)

The Trustee agrees that section 546(e) is not in conflict with SIPA.  But the district court's decision creates one.  SIPA expressly permits a trustee to recover preferential transfers to a customer; under *Greiff*, whenever a customer opens a brokerage account pursuant to a customer agreement and trading authorization, every transfer is protected under section 546(e).

Indeed, *Greiff* would protect transfers even if the broker did not purport to engage in trading.  This would include transfers to a BLMIS customer who had explicitly instructed Madoff to hold his money in cash.  If the customer had signed Account Opening Documents, he would be protected under section 546(e), even though he had no expectation that BLMIS would trade for him.

24

More egregiously, *Greiff* eviscerates the ability of a SIPA trustee to recover preferential transfers, as expressly provided in SIPA.  After Madoff was arrested, checks totaling $175,000,000—more than half of the firm's remaining liquid assets—were found on his desk.  *See, e.g.*, Trial Testimony of Meaghan Schmidt, *United States v. O'Hara*, 10-cr-00228 (S.D.N.Y. Oct. 23, 2013) (LTS).  Had the fraud been detected two days later, those checks would have gone to a handful of customers, including friends and family, that Madoff chose to prefer.  And under *Greiff,* any of those preferred customers with antecedent debts could keep that money.  To protect such preferential transfers is flatly inconsistent with SIPA and the Bankruptcy Code.

Contrary to Appellees' view, the statute as written shows that Congress intended to "expos[e] customers to a SIPA trustee's use of state law avoidance remedies" (Fishman Br. 47), as well as preferential and fraudulent transfers under the Code.  Congress could have provided that a SIPA trustee may avoid a broker's transfers to a customer only pursuant to section 548(a)(1)(A); it did not.  It was error for the district court to rewrite the statute.

Appellees' argument also misconstrues SIPA § 78fff-2(c)(3) altogether, claiming that "[t]his clause defines the rights of the customers *after* avoidance." (Fishman Br. 50) (emphasis in original).  This is incorrect.  As one treatise explains, SIPA § 78fff-2(c)(3) permits a trustee to avoid transfers to customers by

deeming "customer property" to have been property of the debtor.  *See* 6 *Collier on Bankruptcy* ¶ 749.02[1] (16th ed. 2011).  SIPA § 78fff-2(c)(3) prevents "one or more customers from depriving other customers of assets by keeping these assets out of the pool available for distribution to customers on a ratable basis." *Id.*  The explicit purpose of SIPA § 78fff-2(c)(3), which is thwarted by *Greiff*, is to harmonize the statutes and permit a SIPA trustee to recover avoidable transfers.

## V.    The Trustee Is Not Collaterally Estopped

There is no merit to Appellees' argument that the Trustee is collaterally estopped from bringing this appeal by *Picard v. Katz*, 462 B.R. 447 (S.D.N.Y. 2011) (the "*Katz* Decision") and the subsequent settlement in that case.

Collateral estoppel applies where: "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." *Proctor v. LeClaire*, 715 F.3d 402, 414 (2d. Cir. 2013). Not one of these required elements is met here.

Collateral estoppel applies only to valid and final judgments.  The *Katz* Decision was not a final judgment nor was any final judgment entered in *Katz* prior to *Greiff*.  After issuing the *Katz* Decision in September 2011, the district court denied the Trustee's request for an immediate appeal, in part because the factual

26

record developed at trial would be relevant to the section 546(e) issue. *Picard v. Katz*, 466 B.R. 208, 211 (S.D.N.Y. 2012). Even in light of the *Katz* Decision, the district court continued to withdraw the reference on hundreds of matters relating to section 546(e) and requested additional briefing on section 546(e) in numerous cases. (SPA-12-13).

On April 27, 2012, the district court granted partial dismissal in *Greiff* after a *de novo* review of section 546(e) and the Account Opening Documents, which it had not considered in *Katz*. (SPA-31). A decision followed on April 30, 2012. (SPA-36-45). On May 23, 2013, the district court entered final judgment on *Greiff* and the hundreds of cases consolidated with it for appeal under Rule 54(b) (SPA-164-165), one week prior to the Court's approval of the *Katz* settlement and two weeks prior to the stipulation of dismissal. *See* Order Approving Settlement Agreement, *Picard v. Katz*, No. 11-03605 (S.D.N.Y. June 1, 2012), ECF No. 192; Stipulation and Order Vol. Dismissal, *Picard v. Katz*, No. 11-03605 (S.D.N.Y. June 6, 2012), ECF No. 193 (the "*Katz* Stipulation"). Accordingly, collateral estoppel is inapplicable here.

### A. Appellees Concede the Issues Are Not Identical and the Trustee Did Not Have a Full and Fair Opportunity to Litigate

Collateral estoppel applies to prevent the re-litigation of an identical issue of ultimate fact. *Ball v. A.O. Smith Corp.,* 451 F.3d 66, 69 (2d. Cir. 2006); *Leather v. Eyck,* 180 F.3d 420, 424 (2d Cir. 1999). Any uncertainty as to what was actually

27

litigated in a prior action must be resolved against preclusion. *See Legnani v. Alitalia Linee Aree Italiane, SpA*, 400 F.3d 139, 142 n.2 (2d Cir. 2005) (quotation omitted). It is Appellees' burden to prove that the issues are identical. *Proctor*, 715 F.3d at 414.

Here, the district court itself acknowledged that each withdrawn case is different. Tr. of Proceeding re: Conference at 19, *Picard v. Kelman Partners Ltd. P'ship*, No. 11 Civ. 5513 (JSR) (Oct. 3, 2011), ECF No. 4; *see also Katz*, 466 B.R. at 211 (noting that issues in the Trustee's actions are distinct). And, critically, the only Appellees to address collateral estoppel concede the issues here are not identical to those in *Katz*. (Fishman Br. 55, n.29). This alone should end the inquiry.

Similarly, collateral estoppel would apply only if Appellees had shown, "*with clarity and certainty*," *Postlewaite v. McGraw-Hill Inc.*, 333 F.3d 42, 49 (2d Cir. 2003) (emphasis in original) (citations omitted), that the relevant issue was actually litigated and decided by reference to sufficient judicial findings of fact. *See, e.g.*, *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 326-27 (1955). Here, the district court denied certification in *Katz* precisely because the factual record was lacking. *Katz*, 466 B.R. at 211 (noting "that the factual record developed at the forthcoming trial of this case will likely have relevance to many of the issues"). The district court explicitly noted that the record did not include BLMIS customer

agreements which, together with "the context in which they were made [would] likely be presented as evidence at trial . . . ." *Id.* Subsequently, in *Greiff*, the district court reviewed the Account Opening Documents and relied on them for its ruling.

Nor did the Trustee have a full and fair opportunity to litigate in *Katz*, which requires "ample opportunity to present evidence and exhibits, and . . . appellate review." *Studio Art Theater of Evansville, Inc. v. City of Evansvile, Ind.*, 76 F.3d 128, 131 (7th Cir. 1996). The Trustee was not afforded the opportunity to present evidence in *Katz* and was denied appellate review. *See Katz*, 466 B.R. at 209. For these reasons alone, collateral estoppel is inapplicable.

### B.   *Katz* Was Not a Final Judgment on the Merits

The *Katz* ruling was not final. Unlike the Rule 12(b) dismissals relied on by the defendants, *Katz* was not converted into final judgment, nor did it dispose of *all* relevant claims and terminate the defendants' involvement in the lawsuit.

(Fishman Br. 55-56.)[12]  Appellees cannot even meet Judge Friendly's more liberal test for "finality" on which they rely.  *See Lummus Co. v. Commonwealth Oil Ref. Co.*, 297 F.2d 80, 89 (2d Cir. 1961) (Friendly, J.) (finality "turns upon such factors as the nature of the decision (i.e., that it was not avowedly tentative), the adequacy of the hearing, and the opportunity for review.").

    The Trustee had neither the opportunity to present factual evidence nor appellate review.  And the interlocutory ruling in *Katz* was "avowedly tentative," as demonstrated by, among other things, the district court's refusal to certify an appeal.  *Katz*, 466 B.R. at 209-10.  The district court acknowledged in *Katz* that it had not issued written opinions on some of the issues on which it had ruled, and indicated it might defer on those opinions since "[m]ost of those issues will probably come up in other matters, so it will be more appropriate to write there."  Tr. of Proceedings re: Conference at 12, *Picard v. Katz*, No. 11-03605 (S.D.N.Y.

---

[12] The *Katz* Stipulation is not an adjudication on the merits for collateral estoppel purposes.  First, it was not entered until after final judgment in *Greiff*.  Second, a stipulation of dismissal only meets this standard in the rare situation when the judgment contains certain specific findings of fact, which the *Katz* Stipulation did not.  *See e.g. Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 289 (2d Cir. 2002) (quotations omitted) (stipulation of settlement unaccompanied by findings does not bind parties on any issue); *Motrade v. Rizkozaan, Inc.*, No. 95 Civ. 6545 (DC), 1998 WL 108013, at *5 (S.D.N.Y. Mar. 11, 1998).  The cases cited by Appellees are not to the contrary: *Nemaizer v. Baker*, 793 F.2d 58 (2d Cir. 1986), involved *res judicata* not collateral estoppel, while *Wellons, Inc. v. T.E. Ibberson Co.*, 869 F.2d 116 (8th Cir. 1989), stands for the proposition that an arbitration award will not lose its preclusive effect if it is modified by a settlement agreement.

Mar. 19, 2012), ECF No. 182.  And since *Katz,* the district court has revisited

several of its rulings, choosing to "depart[] from the reasoning" in *Katz* regarding

the application of section 502(d).  Order at 2, *Sec. Investor Prot. Corp. v. Bernard*

*L. Madoff Sec. LLC* (*In re Madoff Sec*.), No. 12-mc-00115 (S.D.N.Y. Feb. 12,

2013), ECF No. 435; *see In re 949 Erie St., Racine, Wis.*, 824 F.2d 538, 541 (7th

Cir. 1987) (collateral estoppel does not apply "to an interlocutory order, which

may be changed by the district court at any time prior to final judgment").

The interlocutory nature of *Katz* is also demonstrated by the district court

continuing to withdraw the reference on the basis of section 546(e) and ordering

further briefing on the issue.  As Judge Friendly explained, "'Finality' in the

context here may mean little more than that the litigation of a particular issue has

reached such a stage that a court sees no really good reason for permitting it to be

litigated again." *Lummus*, 297 F.2d at 89.  There can be no such "finality" where,

as here, the district court explicitly ordered this issue to be litigated again.

The *Katz* Stipulation, which came after the final judgment in *Greiff*, did not

retroactively transform the *Katz* Decision into a final judgment.  The question of

whether a settlement justifies vacatur of a final judgment where a party voluntarily

forfeits its right to appeal is therefore irrelevant.  (Fishman Br. 58).  Appellees'

only example of an interlocutory ruling that was given preclusive effect involved a

partial grant of summary judgment for breach of contract, which included the

31

dispositive factual finding of the defendant's inability to cure. *Siemens Med. Sys. Inc. v. Nuclear Cardiology Sys. Inc.,* 943 F. Supp, 1421, 1432 (D. Colo. 1996).[13] Here, there was no partial summary judgment, nor any fact-finding that such a judgment would entail, even assuming that a partial summary judgment decision could serve as the basis for issue preclusion. *See id*. at 1433 (noting lack of "clear consensus" on proposition); *St. Paul Fire & Marine Ins. Co. v. F.H.*, 55 F.3d 1420, 1425 (9th Cir. 1995) (partial summary judgment ruling in case that settled before entry of final judgment was not "final" for collateral estoppel purposes and had no preclusive effect).

Even if an interlocutory ruling could be "final" for collateral estoppel purposes, it is not here, where the district court: (a) engaged in no fact finding but found a claim facially insufficient as a matter of law; (b) declined to certify the issue for appeal, noting that trial would develop the factual record; (c) withdrew the reference on hundreds of cases to consider the very issue Appellees now argue is precluded; (d) engaged in a subsequent *de novo* analysis of this issue; and (e) based its subsequent decision on facts it did not have before it when it initially ruled. *See Katz*, 466 B.R. at 209, 211; (SPA-39-40).

---

[13] Appellees also rely on patent cases that are inapposite here. *See, e.g.*, *TM Patents v. Int'l Bus. Mach. Corp*., 72 F.Supp.2d 370, 378 n.2 (S.D.N.Y. 1999) (finding pre-verdict rulings preclusive "because of the special finality of a *Markman* ruling in a patent case").

## VI. PetCareRx is Outside the Scope of *Greiff*

PetCareRx concedes it was not a BLMIS customer. It did not execute Account Opening Documents, it did not deposit or withdraw cash from BLMIS, and it had no subjective belief that BLMIS was trading securities on its behalf. (PetCareRx Br. 7-13). Rather, as the Trustee's complaint alleges, BLMIS transferred $2 million to PetCareRx "to acquire and/or maintain an ownership interest" in the company for Madoff's wife, Ruth Madoff, for which BLMIS received no benefit or value in exchange. See Complaint at ¶¶ 2, 20-21, *Picard v. PetCareRx, Inc.*, No. 10-5392 (Bankr. S.D.N.Y. Dec. 6, 2010), ECF No. 1.

This is a classic fraudulent transfer action to recover estate property transferred to a third party. If section 546(e) applies to transfers to PetCareRx, entirely separate issues would have to be determined, including whether section 546(e) applies as a matter of law to a transfer made by a stockbroker (acting outside his broker capacity) to acquire or maintain an ownership interest in a private, closely-held company. These issues were not addressed in *Greiff*.

For these reasons, PetCareRx is not properly part of this appeal. The Trustee consented to entry of final judgment below only in those actions where the Trustee's claims were substantively identical. (SPA-65-67). Except for PetCareRx, the matters for which partial judgments were entered under Fed. R. Civ. P. 54(b) comprised actions against BLMIS customers who received transfers

33

and executed Account Opening Documents.  PetCareRx never filed a motion to dismiss setting forth the reasoning it now puts before this Court.  Accordingly, the Court should return this matter to the district court for a decision specific to PetCareRx.

## VII.  Mandatory Withdrawal of the Reference Was Improper

Because the district court improperly withdrew the reference on mandatory grounds,[14] the impact of its decision is not limited to this case.  Appellees' position that SIPA and unnamed "other federal securities statutes and jurisprudence" would dictate mandatory withdrawal in every SIPA liquidation, something Congress could have provided for had it so intended.  (Fishman Br. 60).  Since section 546(e) is within title 11, the only non-bankruptcy federal law that could require interpretation here is SIPA.  And SIPA cannot be the basis for withdrawal since Congress directed all SIPA proceedings be removed to the bankruptcy court.  SIPA § 78eee-(b)(4).  The fact that a securities law issue may present itself at some point is equally unavailing.  *See Enron Corp. v. JP Morgan Sec., Inc.* (*In re Enron Corp.*), Nos. M-47 (GBD), 01-6034 (AJG), 2008 WL 281972, at *6 (S.D.N.Y. Jan 25, 2008) ("Mere speculation that the bankruptcy court may have to determine, at

---

[14] In a footnote, the district court discusses the issue of permissive withdrawal, but only as to the application of *Stern v. Marshall*.  SPA-16, n.3.

some future time, a securities law issue is an insufficient basis for withdrawing the reference."). Withdrawing the reference on mandatory grounds here was error.

Contrary to Appellees' position, *Stern v. Marshall,* 1315 S.Ct. 2594 (2011), is irrelevant. *Stern*, both itself and as interpreted by the district court in *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 490 B.R. 46 (S.D.N.Y. 2013), goes only to the final adjudication of non-core issues by the bankruptcy court, not its ability to consider Bankruptcy Code defenses that arise in garden variety avoidance actions such those against Appellees. *See Stern,* 131 S. Ct. at 2630. *Stern* provides no support for mandatory withdrawal here.

## CONCLUSION

For the foregoing reasons, the Trustee respectfully requests that this Court reverse and vacate (i) *Greiff* and all related orders, and (ii) the order withdrawing the reference of *Greiff* and all subsequent orders withdrawing the reference of these cases; and remand these cases to the bankruptcy court for further proceedings.

35

Date: New York, New York          Respectfully submitted,
       November 22, 2013

/s/ David J. Sheehan
David J. Sheehan
Oren J. Warshavsky
Tracy L. Cole
Seanna R. Brown
Carrie A. Longstaff
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201

*Attorneys for Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and the Estate of Bernard L. Madoff*

/s/ Howard L. Simon
Howard L. Simon
WINDELS MARX LANE &
MITTENDORF, LLP
156 West 56th Street
New York, New York 10019
Telephone: (212) 237-1000
Facsimile: (212) 262-1215

*Conflicts Counsel to Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*

/s/ Matthew B. Lunn
Matthew B. Lunn
YOUNG CONAWAY STARGATT &
TAYLOR, LLP

36

Rockefeller Center
1270 Avenue of the Americas
Suite 2210
New York, NY 10020
Telephone: (212) 332-8840
Facsimile: (212) 332-8855

*Conflicts Counsel to Irving H. Picard,*
*Trustee for the Substantively Consolidated*
*SIPA Liquidation of Bernard L. Madoff*
*Investment Securities LLC and Bernard L.*
*Madoff*

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE
## <u>REQUIREMENTS AND TYPE STYLE REQUIREMENTS</u>

This brief complies with the type-volume limitation of Fed. R. App. P.

32(a)(7)(B) because this brief contains 8,369 words, excluding the parts of the

brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P.

32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this

brief has been prepared in a proportionally spaced typeface using Microsoft Office

Word in 14-point Times New Roman font.

Date:  New York, New York
       November 22, 2013

Respectfully Submitted,

 /s/ David J. Sheehan
David J. Sheehan
BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone:  (212) 589-4200
Facsimile:  (212) 589-4201

*Attorneys for Irving H. Picard, Trustee
for the Substantively Consolidated SIPA
Liquidation of Bernard L. Madoff
Investment Securities LLC and the
Estate of Bernard L. Madoff*

# CERTIFICATE OF SERVICE & CM/ECF FILING
## 12-2557-bk(L)

I hereby certify that I caused the foregoing Reply Brief to be served on All Counsel via Electronic Mail generated by the Court's electronic filing system (CM/ECF) with a Notice of Docket Activity pursuant to Local Appellate Rule 25:

I further certify that one of the participants in the case is not a registered CM/ECF user. We have mailed a CD-ROM and foregoing document by U.S. First Class Mail for delivery to the following non-CM/ECF participant:

Mr. Stanley Plesent
24 Maple Avenue
Larchmont, New York 10538

I further certify that the foregoing document will be served electronically on the non-CM/ECF participants listed below at the following email address bdon@daibes.com:

Fred A. Daibes Madoff Securities
Trust c/o Fred A. Daibes
1000 Portside Drive
Edgewater, NJ 07020

Fred A. Daibes LLC
c/o Fred A. Daibes Enterprises
1000 Portside Drive
Edgewater, NJ 07020

Fred A. Daibes Madoff Securities
Trust c/o Fred A. Daibes
99 Gorge Road, Apt. 2010
Edgewater, NJ 07020

Fred A. Daibes
99 Gorge Road, Apt. 2010
Edgewater, NJ 07020

1096-1100 River Road Associates, LLC
c/o Fred A. Daibes Enterprises
1000 Portside Drive
Edgewater, NJ 07020

I certify that an electronic copy was uploaded to the Court's electronic filing system. Six hard copies of the foregoing Reply Brief were sent to the Clerk's Office by hand delivery to:

Clerk of Court
United States Court of Appeals, Second Circuit
United States Courthouse
500 Pearl Street, 3rd floor
New York, New York 10007
(212) 857-8500

on this 22nd day of November 2013.

/s/ Nadia R. Oswald-Hamid
Nadia Oswald-Hamid